# United States Court of Appeals
## For the First Circuit

No. 12-1285

ORATAI CULHANE,

Plaintiff, Appellant,

v.

AURORA LOAN SERVICES OF NEBRASKA,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Lynch, Chief Judge,
Souter,* Associate Justice,
and Selya, Circuit Judge.

George E. Babcock, with whom Rockwell P. Ludden and Ludden Kramer Law P.C. were on brief, for appellant.
Reneau J. Longoria, with whom John A. Doonan, Erin P. Severini and Doonan, Graves & Longoria, LLC were on brief, for appellee.

February 15, 2013

_____
    * Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

**SELYA**, **Circuit Judge**. As the millennium dawned, American financial markets soared to new heights. One of the vehicles that propelled this dizzying flight involved the bundling and securitization of residential mortgage loans.[1] But all good things come to an end, cf. Geoffrey Chaucer, Troilus and Criseyde (circa 1374) ("There is an end to everything, to good things as well."), and it was not long before the economy faltered and the housing bubble burst. A rash of residential mortgage foreclosures followed.

Novel practices had been devised to facilitate the bundling and securitization of residential mortgage loans — and those practices gave rise to hitherto unanswered questions in the foreclosure context. The fact pattern here is emblematic: the mortgagor's note was delivered to one party (the lender) and then transferred; the mortgage itself was granted to a different entity, Mortgage Electronic Registration Systems, Inc.,[2] and later assigned to the foreclosing entity. We are asked, as a matter of first

---

[1] Generally speaking, securitization is the process of pooling financial assets such as loans or accounts receivable to create an investment instrument (i.e., a security). Thus, the securitization of mortgage loans involves the creation of a mortgage-backed security: mortgage loans are purchased from lenders, bundled, and combined to create a single debt instrument. Interests in this instrument can then be sold to investors who enjoy the benefit of the revenue stream flowing from the mortgage payments.

[2] Mortgage Electronic Registration Systems, Inc. is a subsidiary of MERSCORP, Inc. Both are Delaware corporations based in Virginia. For simplicity's sake, we refer to them collectively as "MERS."

impression for this court, to pass upon not only the legality and effect of this arrangement but also the mortgagor's right to challenge it. The substantive law of Massachusetts controls our inquiry.

After careful consideration, we conclude that, in the circumstances of this case, the mortgagor has standing to contest the validity of the mortgage assignment made by MERS to the foreclosing entity. We also conclude, however, that the MERS framework is faithful to the age-old tenets of mortgage law in Massachusetts and that, therefore, the foreclosure here was not unlawful.

## I. BACKGROUND

The relevant facts are essentially undisputed. In April of 2006, plaintiff-appellant Oratai Culhane refinanced the mortgage on her single-family home in Milton, Massachusetts. To accomplish this refinancing, she delivered a promissory note in the face amount of $548,000 to the lender, Preferred Financial Group, Inc., doing business as Preferred Mortgage Services (Preferred). She simultaneously executed a separate mortgage indenture in favor of MERS as "nominee for [Preferred] and [Preferred]'s successors and assigns." This mortgage, which secured the promissory note, was recorded on April 11, 2006 in the Norfolk County Registry of Deeds.

Under the terms of the mortgage, MERS, as mortgagee of record, held legal title to the mortgaged premises. As such, it enjoyed a power of sale "solely as nominee" for the lender.

At this juncture, we think it helpful to provide some background about the mysterious entity known as MERS. We introduce this subject with a riddle: What entity is not a bank but claims to hold title to approximately half of all the mortgaged homes in the country? The answer is MERS. See Michael Powell & Gretchen Morgenson, MERS? It May Have Swallowed Your Loan, N.Y. Times, Mar. 6, 2011, at BU1.

MERS was formed by a consortium of residential mortgage lenders and investors desiring to streamline the process of transferring ownership of mortgage loans in order to facilitate securitization. See Christopher L. Peterson, Foreclosure, Subprime Mortgage Lending, and the Mortgage Electronic Registration System, 78 U. Cin. L. Rev. 1359, 1368-69 (2010). Various entities involved in the residential mortgage lending business can become "members" of MERS. As such, they pay an annual fee and agree to the rules of membership. Lender members may name MERS as mortgagee in mortgages that they originate, service, or own.

MERS's mortgagee status is narrowly circumscribed: it acts solely as "nominee" for the owner or servicer of the mortgage, including the owner's or servicer's successors and assigns. There is one condition: the party for whom MERS serves as nominee must be

a member of MERS. The upshot of this arrangement is that MERS holds the legal title to the mortgage as mortgagee of record, but it does not have any beneficial interest in the loan.

MERS maintains an electronic database cataloguing the mortgages that it holds. This database tracks the identities of the noteholders and servicers of the underlying loans. When a note is sold by one MERS member to another, the sale is memorialized in the MERS database, and MERS remains the mortgagee of record.

If a note within the MERS system is sold to a nonmember, MERS assigns the mortgage to the new noteholder or its designee. MERS's involvement ends at that point. To expedite the execution of assignments, MERS designates "certifying officers." These "certifying officers" are typically employees of member firms. MERS authorizes these persons, through formal corporate resolutions, to execute assignments on its behalf. This system reduces paperwork and avoids fees that otherwise would be required to record assignments of mortgages at local recording offices. Similarly, it facilitates the bundling and securitization of loans.

This case offers a paradigmatic example of how the MERS framework operates. After making the loan, Preferred (a MERS member) subsequently transferred the plaintiff's note to fellow MERS member Deutsche Bank Trust Company Americas (Deutsche), as trustee for Residential Accredit Loans Inc., Mortgage Asset-Backed

Pass-Through Certificates, Series 2006-QO5 (RALI 2006 Trust).[3] Although the endorsement was undated, the cut-off date for mortgage loans to be transferred into the RALI 2006 Trust was May 1, 2006, so the endorsement necessarily took place on or before that date (the validity of this transfer was unsuccessfully challenged below, but the plaintiff does not contest it in her appellate briefs).

At the times relevant hereto, defendant-appellee Aurora Loan Services of Nebraska (Aurora), acting for Deutsche, had the responsibility of servicing the loans held in the RALI 2006 Trust. In an assignment dated April 7, 2009, MERS transferred the mortgage to Aurora. This assignment, recorded on April 24, 2009, was executed by Joann Rein, who is both an employee of Aurora and a "certifying officer" for MERS.

When the plaintiff fell behind in her note payments, Aurora — now both servicer of the note and mortgagee of record — initiated foreclosure proceedings. It first filed a complaint in the Land Court seeking a declaration that the plaintiff was not entitled to the protections of the Servicemembers Civil Relief Act (SCRA), 50 U.S.C. app. § 533. The Land Court ruled that the SCRA presented no obstacle to Aurora's enforcement of its power of sale. See Mass. Gen. Laws ch. 183, § 21; id. ch. 244, § 14.

_____

[3] The RALI 2006 Trust holds a pool of one- to four-family residential, payment-option, adjustable-rate, first-lien mortgage loans with a negative amortization feature.

Next, Aurora published a notice of intent to foreclose the mortgage and sent copies of this notice to all the required parties. See id. ch. 244, § 14. The foreclosure, originally set for October 22, 2009, was postponed from time to time due to the plaintiff's requests for loan modifications under the Home Affordable Modification Program, 12 U.S.C. § 5219a, and a series of abortive bankruptcy proceedings. When these hurdles were cleared, the foreclosure was set for June 20, 2011.

Three days before the rescheduled foreclosure, the plaintiff repaired to the state superior court seeking both injunctive relief and monetary damages. Citing diversity of citizenship and the existence of a controversy in the requisite amount, Aurora removed the case to the federal district court. See 28 U.S.C. §§ 1332(a), 1441. It then moved for summary judgment. After some preliminary skirmishing, the inquiry narrowed to the question of how, if at all, MERS's involvement in the chain of title impacted Aurora's authority to foreclose. The district court resolved this question in favor of Aurora. Culhane v. Aurora Loan Servs., 826 F. Supp. 2d 352, 378-79 (D. Mass. 2011).

On December 8, 2011 — ten days after the district court entered summary judgment — Aurora foreclosed the mortgage on the plaintiff's property by entry and sale, purchasing the property for $490,000.

## II. ANALYSIS

In Massachusetts, when a mortgage includes a power of sale — as this mortgage does — the mortgagee "may foreclose without obtaining prior judicial authorization 'upon any default in the performance or observance' of the mortgage, including, of course, nonpayment of the underlying mortgage note." Eaton v. Fed. Nat'l Mortg. Ass'n, 969 N.E.2d 1118, 1127 (Mass. 2012) (footnote and internal citation omitted) (quoting Mass. Gen. Laws ch. 183, § 21). The Massachusetts Supreme Judicial Court (SJC) recently interpreted the statutes governing foreclosure by sale as requiring a foreclosing mortgagee both to control the note (either as the noteholder or as its agent) and to hold the mortgage. Id. at 1129 & n.20, 1131. The SJC expressly stated that this binary requirement constituted a new statutory interpretation and, therefore, was to be given only prospective effect. See id. at 1132-33; accord McKenna v. Wells Fargo Bank, 693 F.3d 207, 215 (1st Cir. 2012).

In the case at hand, the plaintiff does not contest that, at the time of the foreclosure, Deutsche held her note and that Aurora was properly denominated as the Deutsche loan servicer. At that time, the mortgage stood in Aurora's name — but the plaintiff does not concede the validity of the assignment from MERS to

Aurora.  Our inquiry, therefore, focuses on the validity of that assignment.[4]

There is, however, a threshold issue.  Because Aurora insists that the plaintiff lacks standing to challenge the validity of the assignment to Aurora, we start with this issue.

**A.  Standing.**

Whether a mortgagor has standing to challenge the assignment of her mortgage — an assignment to which she is not a party and of which she is not a third-party beneficiary — is a matter of first impression for this court.  The nisi prius courts within the circuit have expressed divergent views.  Compare, e.g., Butler v. Deutsche Bank Trust Co., No. 12-10337, 2012 WL 3518560, at *6-7 (D. Mass. Aug. 14, 2012) (holding that mortgagor has limited standing), with, e.g., Oum v. Wells Fargo, 842 F. Supp. 2d 407, 415 (D. Mass. 2012) (holding that mortgagor lacks standing), with, e.g., Rosa v. Mortg. Elec. Sys., Inc., 821 F. Supp. 2d 423, 429 n.5 (D. Mass. 2011) (holding that mortgagors "appear to have standing").  We conclude that a nonparty mortgagor, like the plaintiff, has standing to raise certain challenges to the assignment of her mortgage.

"The existence vel non of standing is a legal question and, therefore, engenders de novo review."  Me. People's Alliance

---

[4] Because we resolve this question in favor of Aurora, see text infra, we need not dwell on the purely prospective effect of the SJC's decision in Eaton.

& Natural Res. Def. Council v. Mallinckrodt, Inc., 471 F.3d 277, 283 (1st Cir. 2006). The Constitution limits the judicial power of federal courts to actual cases and controversies. U.S. Const. art. III, § 2, cl. 1. This criterion is satisfied only when the plaintiff has "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends." Baker v. Carr, 369 U.S. 186, 204 (1962).

When a plaintiff sues in a federal court, she ordinarily must shoulder the burden of establishing standing. Bennett v. Spear, 520 U.S. 154, 167-68 (1997). The onus remains the same when — as in this case — the plaintiff sues in state court and the defendant invokes federal jurisdiction through removal. Once removal has been effected, the burden of going forward with the claim in federal court (including the burden of establishing standing) still rests with the plaintiff. See DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 342 n.3 (2006).

The essence of standing is that a plaintiff must have a personal stake in the outcome of the litigation. Ramírez v. Sánchez Ramos, 438 F.3d 92, 97 (1st Cir. 2006). To fulfill this personal stake requirement, the plaintiff "must establish each part of a familiar triad: injury, causation, and redressability." Katz v. Pershing, LLC, 672 F.3d 64, 71 (1st Cir. 2012) (citing Lujan v.

Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)).  We examine these three elements as they relate to this litigation.

For purposes of standing doctrine, an injury is defined as "an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical." Lujan, 504 U.S. at 560 (footnote and internal citations and quotation marks omitted).  The foreclosure of the plaintiff's home is unquestionably a concrete and particularized injury to her.

By the same token, there is a direct causal connection between the challenged action and the identified harm.  The action challenged here relates to Aurora's right to foreclose by virtue of the assignment from MERS.  The identified harm — the foreclosure — can be traced directly to Aurora's exercise of the authority purportedly delegated by the assignment.

This leaves the matter of redressability.  We are confident that a determination that Aurora lacked the authority to foreclose would set the stage for redressing the plaintiff's claimed injury.  Her complaint, at least in part, prays for monetary damages as a means of ameliorating the asserted wrong.  No more is exigible.  See Plains Commerce Bank v. Long Family Land & Cattle Co., 554 U.S. 316, 327 (2008).

Of course, standing has a prudential aspect, which overlays its constitutional dimensions.  See Coggeshall v. Mass.

Bd. of Registration of Psychologists, 604 F.3d 658, 666 (1st Cir. 2010). These prudential considerations "ordinarily require a plaintiff to show that his claim is premised on his own legal rights (as opposed to those of a third party), that his claim is not merely a generalized grievance, and that it falls within the zone of interests protected by the law invoked." Pagán v. Calderón, 448 F.3d 16, 27 (1st Cir. 2006). As applied here, these considerations raise a potential question as to whether the plaintiff's standing is jeopardized by the prudential concern that a litigant should not normally be permitted to assert the rights and interests of a third party. With this in mind, several courts have ruled that mortgagors lack standing to challenge mortgage assignments because they are neither parties to nor third-party beneficiaries of the assignments. See, e.g., Oum, 842 F. Supp. 2d at 413 (citing Edelkind v. Fairmont Funding, Ltd., 539 F. Supp. 2d 449, 453-54 (D. Mass. 2008)); Wenzel v. Sand Canyon Corp., 841 F. Supp. 2d 463, 477-78 (D. Mass. 2012).

We think that these cases paint with too broad a brush. It is true that a nonparty who does not benefit from a contract generally lacks standing to assert rights under that contract. See, e.g., Almond v. Capital Props., Inc., 212 F.3d 20, 24 & n.4 (1st Cir. 2000); Cumis Ins. Soc'y, Inc. v. BJ's Wholesale Club, Inc., 918 N.E.2d 36, 44 (Mass. 2009). But a Massachusetts real property mortgagor finds herself in an unusual position because of

two key facts. First, as explained below, a Massachusetts mortgagor has a legally cognizable right under state law to ensure that any attempted foreclosure on her home is conducted lawfully. See Mass. Gen. Laws ch. 183, § 21; id. ch. 244, § 14. Second, where (as here) a mortgage contains a power of sale, Massachusetts law permits foreclosure without prior judicial authorization. See Eaton, 969 N.E.2d at 1127. Thus — unlike an ordinary debtor who could challenge an assignment as a defense upon being haled into court by the assignee seeking to collect on her debt, see 6A C.J.S. Assignments § 132 (2012) — a Massachusetts mortgagor would be deprived of a means to assert her legal protections without having standing to sue. As such, we hold only that Massachusetts mortgagors, under circumstances comparable to those in this case, have standing to challenge a mortgage assignment.

The relevant statutory provisions explicitly state that only a mortgagee has the authority to exercise the statutory power of sale. The SJC has gone so far as to state that "[a]ny effort to foreclose by a party lacking jurisdiction and authority to carry out a foreclosure under these statutes is void." U.S. Bank Nat'l Ass'n v. Ibanez, 941 N.E.2d 40, 50 (Mass. 2011) (internal quotation marks omitted). To this end, an action may be brought to set aside a void foreclosure. See Rogers v. Barnes, 47 N.E. 602, 603-04 (Mass. 1897). This would be the case where, for instance, valid

legal title was never assigned to the foreclosing entity. See Ibanez, 941 N.E.2d at 50.

The short of it is that, in Massachusetts, a mortgagor has a legally cognizable right to challenge a foreclosing entity's status qua mortgagee. This may, in certain instances, require challenging the validity of an assignment that purports to transfer the mortgage to a successor mortgagee. Standing doctrine is meant to be a shield to protect the court from any role in the adjudication of disputes that do not measure up to a minimum set of adversarial requirements. There is no principled basis for employing standing doctrine as a sword to deprive mortgagors of legal protection conferred upon them under state law. We hold, therefore, that a mortgagor has standing to challenge the assignment of a mortgage on her home to the extent that such a challenge is necessary to contest a foreclosing entity's status qua mortgagee.

We caution that our holding, narrow to begin with, is further circumscribed. We hold only that a mortgagor has standing to challenge a mortgage assignment as invalid, ineffective, or void (if, say, the assignor had nothing to assign or had no authority to make an assignment to a particular assignee). If successful, a challenge of this sort would be sufficient to refute an assignee's status qua mortgagee. See 6A C.J.S. Assignments § 132. Withal, a mortgagor does not have standing to challenge shortcomings in an

assignment that render it merely voidable at the election of one party but otherwise effective to pass legal title.  See, e.g., Serv. Mortg. Corp. v. Welson, 200 N.E. 278, 280 (Mass. 1936); Murphy v. Barnard, 38 N.E. 29, 31 (Mass. 1894); see also 6A C.J.S. Assignments § 132.

In this case, the plaintiff's challenge to the assignment from MERS to Aurora is premised on the notion that MERS never properly held the mortgage and, thus, had no interest to assign. If this were so, the assignment would be void (not merely voidable).  Consequently, the plaintiff has standing to challenge the validity of the assignment.[5]

## B.  **Validity of the Assignment**.

We turn now to the district court's entry of summary judgment on the merits.  In performing our review, we are not shackled to the district court's reasoning but, rather, may uphold its ruling on any ground made manifest by the record.  See Houlton Citizens' Coal. v. Town of Houlton, 175 F.3d 178, 184 (1st Cir. 1999).  We look to Massachusetts for the substantive rules of decision.  Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938); B & T Masonry Constr. Co. v. Pub. Serv. Mut. Ins. Co., 382 F.3d 36, 38 (1st Cir. 2004).

---

[5] We are confident that this holding is consistent with our recent decision in Juárez v. Select Portfolio Servicing, Inc., ___ F.3d ___, ___ (1st Cir. 2013) [No. 11-2431, slip op. at 14-15].  In all events, the standing determination in Juárez rested on the peculiar facts of that case.

-15-

The plaintiff's claim hinges on the asseveration that MERS did not legitimately hold the mortgage at the time of assignment and, therefore, had nothing to assign to Aurora. Even though the original mortgage papers designated MERS as the holder of the mortgage, the plaintiff's thesis runs, this designation was a nullity because MERS never owned the "'beneficial half' of the legal interest" in the mortgage. We reject this thesis: there is no reason to doubt the legitimacy of the common arrangement whereby MERS holds bare legal title as mortgagee of record and the noteholder alone enjoys the beneficial interest in the loan.

The law contemplates distinctions between the legal interest in a mortgage and the beneficial interest in the underlying debt. These are distinct interests, and they may be held by different parties. See Black's Law Dictionary 885 (9th ed. 2009) (defining "beneficial interest" as a "right or expectancy in something (such as a trust or estate), as opposed to legal title to that thing"). So it is here: prior to the assignment to Aurora, MERS held the legal interest and Deutsche held the beneficial interest.

We add that — short of the time of foreclosure — the MERS framework, which customarily separates the legal interest from the beneficial interest, corresponds with longstanding common-law principles regarding mortgages. A mortgage loan involves the borrowing of money by one party, who secures the loan by means of

-16-

a mortgage on a piece of property. It requires the execution of two separate, but related, contracts: a promissory note and a mortgage. Eaton, 969 N.E.2d at 1124. The note embodies the borrower's promise to repay the lender (or, in its stead, the noteholder). Id. The mortgage, in a title theory state like Massachusetts, transfers legal title to the mortgaged premises from the mortgagor to the mortgagee for the sole purpose of securing the loan. Id. The mortgagee holds bare legal title to the mortgaged premises, defeasible upon repayment of the loan (because the mortgagor owns the equity of redemption). Id.

In Massachusetts, the note and the mortgage need not be held by the same entity. The two instruments exist on separate planes, and the transfer of the note does not automatically transfer the mortgage. See id. at 1124-25; Lamson & Co. v. Abrams, 25 N.E.2d 374, 378 (Mass. 1940). But the mortgage (no matter who holds it) is always subject to the note. As a hoary maxim teaches, "the debt is the principal and the mortgage an incident." Morris v. Bacon, 123 Mass. 58, 59 (1877). In other words, the note is the beneficial interest and the mortgage is the legal interest. See id.

Where — as at the inception of this loan — the mortgage and the note are held by separate entities, an equitable trust is implied by law. Eaton, 969 N.E.2d at 1125 & n.10. The SJC has characterized this equitable trust as a kind of resulting trust.

-17-

Id. at 1125 n.10. Under such an arrangement, the mortgagee is an equitable trustee who holds bare legal title to the mortgaged premises in trust for the noteholder. Ibanez, 941 N.E.2d at 53-54. The noteholder possesses an equitable right to demand and obtain an assignment of the mortgage. Id. at 54. This makes perfect sense: if the debtor-mortgagor defaults, the noteholder needs to control the mortgage in order to enforce its bargained-for security interest and collect the debt.

Absent a provision in the mortgage instrument restricting transfer — and there is none here[6] — a mortgagee may assign its mortgage to another party. Because such an assignment is an interest in land, it requires a writing signed by the assignor. See Mass. Gen. Laws ch. 183, § 3; Ibanez, 941 N.E.2d at 51. In the same vein, a noteholder may transfer the note to another. See U.C.C. §§ 3-205, 3-301. An equitable trust exists between the mortgagee of record and the new noteholder, as such a trust is always implied by Massachusetts law. See Eaton, 969 N.E.2d at 1125 n.10; Ibanez, 941 N.E.2d at 53-54.

---

[6] The plaintiff suggests that a mortgage provision concerning notice to the borrower would be breached if the mortgagee transferred the mortgage without the note. This provision states: "[t]he Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to the Borrower." This suggestion is jejune. For one thing, this language is permissive and by no means prohibits the separation of the two instruments. For another thing, the instruments were separated upon their inception: Preferred was granted the note and MERS the mortgage.

-18-

The plaintiff's argument cannot overcome these venerable precedents. Massachusetts law makes pellucid that the mortgage and the note are separate instruments; when held by separate parties, the mortgagee holds a bare legal interest and the noteholder enjoys the beneficial interest. See Eaton, 969 N.E.2d at 1124. The mortgagee need not possess any scintilla of a beneficial interest in order to hold the mortgage.[7] Thus, MERS's role as mortgagee of record and custodian of the bare legal interest as nominee for the member-noteholder, and the member-noteholder's role as owner of the beneficial interest in the loan, fit comfortably with each other and fit comfortably within the structure of Massachusetts mortgage law.

Here, moreover, MERS had the authority twice over to assign the mortgage to Aurora. This authority derived both from MERS's status as equitable trustee and from the terms of the mortgage contract. We already have explained the question of the resulting trust that arises in this context. See text supra. We explain below how the terms of the mortgage contract replicate this authority.

The terms of the mortgage contract, to which the plaintiff expressly agreed, authorize the transfer to Aurora. The

_____

[7] The SJC has made clear that it is only at the time of foreclosure that a mortgagee must also hold or control the beneficial interest in the loan. See Eaton, 969 N.E.2d at 1121, 1125-31, 1132 n.27.

-19-

mortgage papers denominated MERS as mortgagee "solely as nominee for [Preferred] and [Preferred]'s successors and assigns." Under Massachusetts law, a nominee in such a situation holds title for the owner of the beneficial interest. See Morrison v. Lennett, 616 N.E.2d 92, 94-95 (Mass. 1993); Black's Law Dictionary 1149. MERS originally held title as nominee for Preferred; Preferred assigned its beneficial interest in the loan to Deutsche; and Deutsche designated Aurora as its loan servicer. MERS was, therefore, authorized by the terms of the contract to transfer the mortgage at the direction of Aurora.

In the assignment, MERS transferred to Aurora what it held: bare legal title to the mortgaged property.[8] That transfer was valid. See Eaton, 969 N.E.2d at 1124. It follows that Aurora properly held the mortgage and thus possessed the authority to foreclose. Mass. Gen. Laws ch. 183, § 21; id. ch. 244, § 14; see Eaton, 969 N.E.2d at 1124, 1129; Ibanez, 941 N.E.2d at 53.

In an effort to change the trajectory of the debate, the plaintiff makes a two-pronged argument. We find both prongs unedifying.

---

[8] The language of the assignment might be read to suggest that MERS also purposed to assign the note. It is plain, however, that MERS never held the note. We need not probe this point because this superfluous language does not affect the validity of the transfer of legal title to the mortgaged property. See Deutsche Bank Nat'l Trust Co. v. Cicchelli, Nos. 10 MISC. 423350, 10 MISC. 436809, 2011 WL 3805905, at *3 n.9 (Mass. Land Ct. Aug. 24, 2011).

Both aspects of the plaintiff's argument are offered in support of the proposition that the assignment to Aurora does not comply with Mass. Gen. Laws ch. 183, § 54B. This statute provides in pertinent part:

> [An] assignment of mortgage . . . if executed before a notary public, . . . by a person purporting to hold the position of president, vice president, treasurer, clerk, secretary, cashier, loan representative, principal, investment, mortgage or other officer, agent, asset manager, or other similar office or position, including assistant to any such office or position, of the entity holding such mortgage, or otherwise purporting to be an authorized signatory for such entity . . . shall be binding upon such entity and shall be entitled to be recorded . . . .

Id. The assignment of the mortgage from MERS to Aurora adhered to these requirements: it was signed by Joanne Rein (an individual duly certified as a vice president of MERS) and thereafter notarized.

To be sure, Rein's primary occupation at the time was as an employee of Aurora. Her designation as a vice president of MERS was put in place purely as a matter of administrative convenience. The plaintiff suggests that this duality somehow undermines the legitimacy of Rein's status as a certifying officer.

This suggestion is little more than wishful thinking. The Massachusetts statute neither places restrictions on who may be elected as an officer of the assignor nor imposes special requirements (say, regular employment) on who may serve as a vice

-21-

president of an assignor corporation. While MERS's practice of appointing employees of member firms as certifying officers can be disparaged on policy grounds, such policy judgments are for the legislature, not the courts. As the Supreme Court explained, "[c]ourts may not create their own limitations on legislation, no matter how alluring the policy arguments for doing so." Brogan v. United States, 522 U.S. 398, 408 (1998).

The second prong of the plaintiff's argument posits that MERS was not the "entity holding such mortgage" within the purview of section 54B. But this is simply an old wine in a new bottle: we already have refuted the substance of this argument, see text supra, and we see no point in decanting it again.

We need not paint the lily. We conclude, without serious question, that MERS validly held the mortgage on the plaintiff's premises at the time of the assignment to Aurora. This leads to two further conclusions: the assignment was valid, and Aurora properly exercised the statutory power of sale as both the holder of the mortgage and the loan servicer for the noteholder. See Mass. Gen. Laws ch. 183, § 21; id. ch. 244, § 14; Eaton, 969 N.E.2d at 1129.

### C. Constitutional Challenges.

In a last-ditch effort to turn the tables, the plaintiff asserts that the transfer of her mortgage and the ensuing

foreclosure resulted in constitutional transgressions. This assertion is too late and, in all events, has little to commend it.

The plaintiff raised no constitutional challenges below. The challenges that she now attempts to advance are therefore forfeit. Dávila v. Corporación de P.R. para la Difusión Pública, 498 F.3d 9, 14 & n.2 (1st Cir. 2007). Accordingly, our review is for plain error. Tasker v. DHL Ret. Sav. Plan, 621 F.3d 34, 40 (1st Cir. 2010).

There is no error here, plain or otherwise. The plaintiff claims that the district court's application of section 54B violated her procedural and substantive due process rights and her right to equal protection by (i) denying her the opportunity to determine whether the assignment to Aurora was valid and (ii) arbitrarily including her in a class of mortgagors whose mortgages were assigned by the actual holder. In the last analysis, these remonstrances are contingent on the plaintiff's core contention that MERS did not validly hold the mortgage at the time of its assignment to Aurora. Because we have concluded that MERS validly held the mortgage at that time, see supra Part II(B), her constitutional claims necessarily fail.

## III.  CONCLUSION

We need go no further.[9]  For the reasons elucidated above, we conclude that Aurora's foreclosure of the plaintiff's property complied with the requirements of applicable law.

**Affirmed**.

---

[9] To the extent (if at all) that the plaintiff has attempted to advance other arguments, we reject them as incoherent, unaccompanied by any developed argumentation, or both.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).