Anthony Bucci et al.            :

        v.                      :

Lehman Brothers Bank, FSB et al.   :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Tel. 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Anthony Bucci et al.       :

v.           :

Lehman Brothers Bank, FSB et al.   :

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Justice Flaherty, for the Court.** In this case, we are asked to determine whether a nominee of a mortgage lender, who holds only legal title to the mortgage, but who is not the holder of the accompanying promissory note, may exercise the statutory power of sale and foreclose on the mortgage. On May 15, 2007, Anthony Bucci borrowed $249,900 from Lehman Brothers Bank, FSB (Lehman Brothers) to finance the purchase of a home, and he signed an adjustable rate note (note) that evidenced the debt. On that same date, he and his wife, Stephanie Bucci (collectively, the Buccis or plaintiffs) executed a mortgage on the property that secured the loan.[1] Like many loans in the modern era of lending, even though the note was made payable to the lender—in this case Lehman Brothers—the mortgage was granted to Mortgage Electronic Registration Systems, Inc. (MERS), as nominee for the lender and the lender's successors and assigns. In October 2008, the plaintiffs ceased making loan payments, thereby defaulting on the note. Sometime thereafter, MERS initiated foreclosure proceedings. A foreclosure sale was scheduled, but the day before it was to take place, the plaintiffs commenced an action seeking a

---

[1] It appears from the trial justice's decision and from the copies of the note and mortgage in the record that, although both plaintiffs are named in the mortgage deed, only Anthony Bucci signed the note that evidenced the loan. However, this fact does not affect our decision in this case.

declaratory judgment and injunctive relief, in which they sought to prevent MERS from exercising the power of sale contained in the mortgage. The trial justice denied the plaintiffs' request, and judgment was entered on behalf of the defendants on September 21, 2009. The plaintiffs timely appealed to this Court. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

**I**

**Facts and Travel**

**A**

**MERS**

To begin, we believe that it is important to an understanding of this case to set forth a description of MERS and the role that it plays in the mortgage industry. In 1993, several major participants in the lending community collaborated to form a national electronic registration system that would track the transfer of ownership interests in residential loans (the MERS® System). MERSCORP, Inc. v. Romaine, 861 N.E.2d 81, 83 (N.Y. 2006). The MERS® System was developed to allow for more efficient transfers of those interests in the primary and secondary mortgage markets. Jackson v. Mortgage Electronic Registration Systems, Inc., 770 N.W.2d 487, 490 (Minn. 2009).

The primary mortgage market consists mainly of home loans that are made to consumers. Jackson, 770 N.W.2d at 490. However, the loans are often "bundled" and sold to institutional investors on the secondary mortgage market. Id. In turn, the institutional investors often repackage and resell the loans or securitize them and sell shares of the resulting securities. Id. According to MERS, prior to the creation of its registration system, the constant buying and selling of mortgage-backed loans became costly and time-consuming, because each transfer

required that an assignment of the mortgage be recorded in the local land evidence records.  It also became difficult to determine what entity owned the beneficial interests in these loans at any given time, because those interests were bought and sold with such frequency, often leading to recording errors. Mortgage Electronic Registration Systems, Inc. v. Bellistri, 2010 WL 2720802 at *7 (E.D. Mo. July 1, 2010).  The MERS® System was developed to bring efficiency and order to this increasingly complex industry. Jackson, 770 N.W.2d at 490.

In order to take advantage of the MERS® System, lenders and other entities must become members of MERSCORP, Inc. (MERSCORP), the corporation that owns the system. MERSCORP is also the parent company of defendant MERS. Bellistri, 2010 WL 2720802 at *6. In a typical MERS transaction, when a loan is made by a member of MERSCORP, the member will be designated as the lender in the promissory note, and MERS will be named in the mortgage as the mortgagee, acting as nominee for the lender and the lender's successors or assigns. Jackson, 770 N.W.2d at 490.  Whenever a note is sold, assigned, or otherwise transferred to another MERSCORP member, MERS remains as the mortgagee of record.  As a result, there is no need to record an assignment of the mortgage in the land evidence records. Id. It is only when a loan is transferred to a nonmember that an assignment of the mortgage must be executed and recorded. Id. at 491.  Consequently, loans can be transferred more quickly and economically, and each transfer can be tracked on the MERS® System.[2] Id.  The typical MERS loan, as just described, was exactly the type of transaction that occurred between plaintiffs and defendants in the matter that confronts this Court.

---

[2] There are obvious benefits that flow from the MERS® System; however, there are also certain drawbacks, such as a lack of transparency, because transfers between members are generally not known to anyone outside the system. See Jackson v. Mortgage Electronic Registration Systems, Inc., 770 N.W.2d 487, 491 (Minn. 2009).

# B

## The Note and Mortgage

In this case, the note included a promise by Mr. Bucci to pay "to the order of [Lehman Brothers]," and it further provided that "[Lehman Brothers] may transfer this Note." The mortgage document defined "Borrower" as plaintiffs Anthony and Stephanie Bucci and further provided that the "Borrower is the mortgagor under this Security Instrument." The mortgage document also provided that "MERS is a separate corporation that is acting solely as a nominee for Lender"—which the mortgage document defined as Lehman Brothers—"and Lender's successors and assigns." It went on to say in clear and unequivocal language that "MERS is the mortgagee under this Security Instrument."

The operative language of the mortgage document read as follows:

"* * * Borrower does hereby mortgage, grant and convey to MERS, (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, with Mortgage Covenants upon the Statutory Condition and with the Statutory Power of Sale, the [mortgaged] property * * *."

"* * *

"Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property, and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument."

The mortgage document further provided that

"[t]he Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower[.] A sale might result in a change in the entity (known as the 'Loan Servicer') that collects Periodic Payments due under the Note and this Security Instrument and performs other

- 4 -

mortgage loan servicing obligations under the Note, this Security Agreement, and Applicable Law[.] There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note[.]"

Additionally, the mortgage document stated that

"Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument * * *. If the default is not cured on or before the date specified in the notice, Lender at its option may * * * invoke the STATUTORY POWER OF SALE and any other remedies permitted by Applicable Law."

The mortgage document also required that, "[i]f Lender invokes the STATUTORY POWER OF SALE, Lender shall mail a copy of a notice of sale to Borrower."

## C

### Travel

After Mr. Bucci defaulted on the note, defendant Aurora Loan Services, LLC (Aurora), the loan servicer at the time, sent Mr. Bucci a letter notifying him that the loan was in default, that he had the right to cure the default, and that "Aurora * * * may start legal action to foreclose on the Mortgage."[3]  When the note was not brought current, MERS, as the mortgage holder and named mortgagee under the mortgage and as nominee for the beneficial owner of the note, initiated foreclosure proceedings by sending out notices of foreclosure.  A foreclosure sale was scheduled for July 10, 2009.

---

[3] A third-party loan servicer is an entity that sends out monthly billing statements and collects payments on behalf of the owner of the note. See generally Adam J. Levitin & Tara Twomey, Mortgage Servicing, 28 Yale J. on Reg. 1, 11, 15-16 (2011). See also G.L. 1956 § 19-14.10-3(6)(E) (defining "servicing mortgage loans" to "mean[], on behalf of the note holder, collecting and receiving payments * * * on obligations due and owing to the note holder pursuant to a residential mortgage loan, and, when the borrower is in default, * * * working with the borrower on behalf of the note holder * * * to modify * * * the obligations, or otherwise finalizing collection of the obligation through the foreclosure process").

One day before the scheduled foreclosure, plaintiffs filed a verified complaint in the Superior Court, seeking declaratory and injunctive relief. Specifically, plaintiffs launched a fusillade of claims, asking the court to declare that: (1) Lehman Brothers was the lender relative to this matter; (2) MERS was not a lender relative to this matter; (3) pursuant to the loan documents, only the lender could invoke the statutory power of sale contained in the mortgage; (4) the pending foreclosure violated the terms and conditions of the loan documents and Rhode Island statutory law; (5) the pending foreclosure be ordered cancelled; (6) plaintiffs could not legally designate MERS as nominee of the lender; (7) there was no proof of agency between MERS and Lehman Brothers; and (8) Aurora, as a servicer, was not allowed by statute to foreclose on a mortgage that it did not own. The plaintiffs also sought injunctive relief to preclude defendants from exercising the statutory power of sale contained in the mortgage.

The plaintiffs argued that the language of the mortgage did not authorize MERS to foreclose. Specifically, they pointed to a provision that said "Lender * * * may invoke the STATUTORY POWER OF SALE," and they asserted that this language precluded MERS from foreclosing because the mortgage defined Lehman Brothers as the lender, not MERS. Furthermore, they asserted that Lehman Brothers never designated MERS as its nominee because, although the mortgage named MERS as nominee, Lehman Brothers never signed the mortgage.

Additionally, plaintiffs argued that MERS was prohibited from foreclosing by G.L. 1956 §§ 34-11-21 and 34-11-22.[4] Specifically, they contended that § 34-11-22 permitted only a

---

[4] General Laws 1956 § 34-11-21, entitled "Statutory mortgage condition," provides:
> "The following condition shall be known as the 'statutory condition', and may be incorporated in any mortgage by reference:
>
> "(Condition)

- 6 -

mortgagee to exercise the power of sale and that MERS was merely a "nominee-mortgagee," an ill-defined entity that lacked the authority to foreclose.  Furthermore, plaintiffs maintained that

---

"Provided, nevertheless, and this conveyance is made upon the express condition, that if the mortgagor or his or her heirs, executors, administrators or assigns shall pay to the mortgagee or his or her heirs, executors, administrators, or assigns the principal and interest of that certain promissory note bearing even date with this deed and secured by this deed, and shall perform every other obligation secured by this deed, at the time provided in the promissory note or in this deed, and shall also pay all taxes and assessments of every kind levied or assessed upon or in respect of the mortgaged premises, then this deed, as also the promissory note, shall become and be absolutely void to all intents and purposes whatsoever."

Section 34-11-22, entitled "Statutory power of sale in mortgage," provides, in pertinent part,

"The following power shall be known as the 'statutory power of sale' and may be incorporated in any mortgage by reference:

"(Power)

"But if default shall be made in the performance or observance of any of the foregoing or other conditions, or if breach shall be made of the covenant for insurance contained in this deed, then it shall be lawful for the mortgagee or his, her or its executors, administrators, successors or assigns to sell, together or in parcels, all and singular the premises hereby granted or intended to be granted, or any part or parts thereof, and the benefit and equity of redemption of the mortgagor and his, her or its heirs, executors, administrators, successors and assigns therein, at public auction upon the premises, or at such other place, if any, as may be designated for that purpose in this deed, or in the published notice of sale first by mailing written notice of the time and place of sale by certified mail, return receipt requested, to the mortgagor, at his or her or its last known address, at least twenty (20) days for mortgagors other than individual consumer mortgagors, and at least thirty (30) days for individual consumer mortgagors, prior to first publishing the notice, including the day of the mailing in the computation; second, by publishing the same at least once each week for three (3) successive weeks in a public newspaper published daily in the city in which the mortgaged premises are situated * * *."

the language of § 34-11-21, which provides that "the mortgagor * * * shall pay to the mortgagee * * * the principal and interest of th[e] * * * promissory note," required that a mortgagee and lender be one and the same. Because MERS was not the lender, and because MERS did not receive principal and interest payments, plaintiffs argued, it could not be the mortgagee under § 34-11-21.

The defendants responded by filing objections to plaintiffs' prayers for declaratory and injunctive relief. They also filed a memorandum in which they argued that MERS was permitted to foreclose by the clear language of the mortgage and that its doing so would not violate the statutes cited by plaintiffs. For further support, defendants provided the court with an affidavit of Cheryl R. Marchant, a Vice President of Aurora, the servicer of the note.

On July 9, 2009, the trial justice ordered that the scheduled foreclosure be stayed until further order of the court. On July 14, 2009, he conducted a hearing on the issue of whether MERS had the legal right to foreclose the mortgage by exercising the statutory power of sale contained therein, or whether injunctive relief should be granted to enjoin defendants from foreclosing.[5]

**D**

**Superior Court Decision**

The trial justice filed a written decision on August 25, 2009. In his decision, he distilled the controversy to two questions of law: (1) whether MERS had the contractual right to foreclose under the note and mortgage; and (2) whether MERS had the statutory authority to do so. As to the first issue, the trial justice found that plaintiffs, by executing the mortgage deed, "specifically

---

[5] The matter was originally set down as a hearing on an application for preliminary injunction; however, the trial justice consolidated the preliminary injunction hearing with the trial on the merits under Rule 65(a)(2) of the Superior Court Rules of Civil Procedure.

granted 'the Statutory Power of Sale' to MERS, as nominee for Lender and Lender's successors and assigns." The trial justice quoted the provision of the mortgage that said that "'if necessary to comply with law or custom, <u>MERS</u> (as nominee for Lender and Lender's successors and assigns) <u>has</u> <u>the</u> <u>right</u> to exercise any or all of those interests, including, but not limited to, the right <u>to</u> <u>foreclose</u> <u>and</u> <u>sell</u> <u>the</u> <u>Property</u> * * *.'" The trial justice concluded that the language in the mortgage, cited by plaintiffs, which provided the lender with the right to invoke the statutory power of sale, did "not negate the previous language in the Mortgage directly granting MERS * * * the right to" foreclose and sell the property.

Although Lehman Brothers no longer held the note at the time this case was heard in the Superior Court, the trial justice nonetheless found that MERS had the contractual authority to foreclose because the mortgage named MERS as the nominee of Lehman Brothers and its "successors and assigns." The trial justice, relying on the affidavit of Cheryl R. Marchant, found that "'[t]he Note ha[d] been indorsed in blank and [wa]s currently held by LaSalle [Bank, NA (LaSalle)] as custodian for the beneficial owner of the Note * * *.'" He then found that LaSalle was acting in a trustee capacity for the owner of the note and that that owner was indeed a "successor or assign" of Lehman Brothers. <u>See</u> G.L. 1956 § 6A-3-205(b) ("When indorsed in blank, an instrument becomes payable to bearer and may be negotiated by transfer of possession alone until specially indorsed."); G.L. 1956 § 6A-1-201(b)(5) ("'Bearer' means a person in possession of a negotiable instrument, document of title, or certificated security that is payable to bearer or indorsed in blank."). Therefore, the trial justice concluded that MERS was the mortgagee as nominee for the current beneficial owner of the note.

Moreover, although Lehman Brothers never signed the mortgage designating MERS as its nominee, the trial justice nonetheless found that it had authorized MERS to act in this

capacity when it disbursed the loan funds to plaintiffs. The trial justice reasoned that "[i]f Lehman [Brothers] had not approved of MERS acting as its nominee, [it] would not have disbursed the loan proceeds to the Buccis."[6]

The trial justice then went on to address plaintiffs' statutory arguments. First, he found that § 34-11-22—which sets forth the statutory power of sale and allows "the mortgagee * * * to sell" the mortgaged property in the event of a default—did not prohibit MERS from exercising that power because the mortgage named MERS as the mortgagee. Furthermore, he said, "[t]he fact that MERS acts in a nominee capacity for the lender and the lender's successors and assigns does not diminish MERS's role as the mortgagee nor is there created a new legal term 'nominee-mortgagee.'"

The trial justice then addressed § 34-11-21, which says that "the mortgagor * * * shall pay to the mortgagee * * * the principal and interest of th[e] * * * promissory note," and found that, despite that statutory phrasing, nothing in that section prohibited MERS from foreclosing on the mortgage. He concluded that the overly literal reading of the statute urged on him by plaintiffs would create an absurd result because it would prohibit loan servicers from collecting principal and interest payments on loans that were secured by real estate mortgages. He reasoned that, "[c]learly, the General Assembly envisioned a role for mortgage servicers in the mortgage lending industry," and he cited G.L. 1956 § 34-26-8(a)(4)—which includes "mortgage servicer" within the definition of "mortgagee" for purposes of that section—to support his reasoning.

---

[6] At trial, the parties stipulated to the facts that were set forth in the Marchant affidavit. Significantly, in paragraph five of the affidavit, Marchant states that "[t]he Note has been indorsed in blank and is currently held by LaSalle as the custodian for the beneficial owner of the Note and/or its agents (including MERS) for whom MERS, in its capacity as mortgagee, is the nominee of the beneficial owner of the Note."

- 10 -

The trial justice determined that MERS was legally authorized to foreclose the Buccis' mortgage by exercising the statutory power of sale. Therefore, he denied their request for declaratory and injunctive relief. Judgment was entered on September 21, 2009, and plaintiffs timely appealed to this Court.

## II

## Discussion

To begin, we shall set out some well-settled principles of real property law regarding mortgages. Generally, there are two operative documents to a real estate loan transaction—a promissory note and a mortgage. The promissory note evidences the obligation of the borrower to repay the monies that have been lent, and the mortgage (or mortgage deed) acts as security for that debt. See generally Pawtucket Institution for Savings v. Gagnon, 475 A.2d 1028, 1030 (R.I. 1984); 11 Am. Jur. 2d Bills and Notes § 29 at 409 (2009). Additionally, "Rhode Island is a title-theory state, in which 'a mortgagee not only obtains a lien upon the real estate by virtue of the grant of the mortgage deed but also obtains legal title to the property subject to defeasance upon payment of the debt.'" 140 Reservoir Avenue Associates v. Sepe Investments, LLC, 941 A.2d 805, 811 (R.I. 2007) (quoting In re D'Ellena, 640 A.2d 530, 533 (R.I. 1994)). Against this backdrop, we shall proceed to decide the matter that is before us.

## A

## Standard of Review

This Court has held that "[a] decision to grant or deny declaratory or injunctive relief is addressed to the sound discretion of the trial justice and will not be disturbed on appeal unless the record demonstrates a clear abuse of discretion or the trial justice committed an error of law."

Hagenberg v. Avedisian, 879 A.2d 436, 441 (R.I. 2005) (citing DiDonato v. Kennedy, 822 A.2d 179, 181 (R.I. 2003)).

We also have held that "[a]n agreed statement of facts operates to submit a controversy for consideration when both parties have agreed upon the ultimate facts." Hagenberg, 879 A.2d at 441 (quoting Randall v. Norberg, 121 R.I. 714, 717, 403 A.2d 240, 242 (1979). In such a case, "our scope of review of the trial justice's decision is narrowly defined." Id. (quoting Randall, 121 R.I. at 717, 403 A.2d at 242). Thus, "the court has no independent fact-finding function and its role is limited to applying the law to the agreed-upon facts." Id. (quoting Randall, 121 R.I. at 717-18, 403 A.2d at 242).

Additionally, we have held that "whether a contract is clear and unambiguous is a question of law." Beacon Mutual Insurance Co. v. Spino Brothers, Inc., 11 A.3d 645, 648 (R.I. 2011) (citing Irene Realty Corp. v. Travelers Property Casualty Co. of America, 973 A.2d 1118, 1122 (R.I. 2009)). Furthermore, after "a contract is determined to be clear and unambiguous, then 'the meaning of its terms constitute a question of law for the court * * *.'" Young v. Warwick Rollermagic Skating Center, Inc., 973 A.2d 553, 558 (R.I. 2009) (quoting Cassidy v. Springfield Life Insurance Co., 106 R.I. 615, 619, 262 A.2d 378, 380 (1970)). "This Court reviews a trial justice's conclusions on questions of law de novo." Beacon Mutual Insurance Co., 11 A.3d at 649 (citing International Brotherhood of Police Officers v. City of East Providence, 989 A.2d 106, 108 (R.I. 2010)). "Accordingly, we review a trial justice's interpretation of a contract de novo." Id. (citing Irene Realty Corp., 973 A.2d at 1122).

Likewise, this Court reviews issues of statutory interpretation de novo. Reynolds v. Town of Jamestown, 45 A.3d 537, 541 (R.I. 2012). "When a statute is clear and unambiguous we are bound to ascribe the plain and ordinary meaning of the words of the statute and our inquiry is at

an end." Town of Burrillville v. Pascoag Apartment Associates, LLC, 950 A.2d 435, 445 (R.I. 2008) (quoting Unistrut Corp. v. State Department of Labor and Training, 922 A.2d 93, 98 (R.I. 2007)). "However, when a statute is susceptible of more than one meaning, we employ our well-established maxims of statutory construction in an effort to glean the intent of the Legislature." Id. (quoting Unistrut Corp., 922 A.2d at 98-99.).

**B**

**Analysis**

On appeal, plaintiffs list myriad reasons why they believe the trial justice erred in his decision; however, distilled to their essence, their arguments can be condensed into two categories. First, plaintiffs argue that the trial justice erred when he found that defendants had the contractual authority to foreclose the Bucci mortgage because they argue that no agency or contractual relationship exists between MERS and the note holder. Second, plaintiffs contend that the trial justice erred when he found that defendants had the statutory authority to foreclose.[7] However, before this Court reaches these issues, we must address whether or not they have been rendered moot by events occurring after the trial justice handed down his decision.

---

[7] At various points throughout the record and in the parties' briefs, the issues before us are framed in terms of MERS's "standing" to foreclose. We note, however, that the term "standing" refers to "[a] party's right to make a legal claim or seek judicial enforcement of a duty or right." Black's Law Dictionary 1536 (9th ed. 2009). Therefore, "[a] standing inquiry focuses on the party who is advancing the claim," not the party defending against that claim. Bowen v. Mollis, 945 A.2d 314, 317 (R.I. 2008). In many cases involving MERS, the issue of standing is raised when MERS, acting as a plaintiff or a movant, is seeking to initiate judicial foreclosure proceedings, or is seeking relief from stay from a bankruptcy court so that a foreclosure may proceed. See, e.g., Mortgage Electronic Registration Systems, Inc. v. Saunders, 2 A.3d 289, 293 (Me. 2010); In re Huggins, 357 B.R. 180, 181-82 (Bankr. D. Mass. 2006). However, in this case, MERS is a defendant, and therefore, we are not concerned about its standing to sue. Although the issue of MERS's standing to commence judicial action may find its way to this Court in the future, that issue is not before us today. The salient issue that is before this Court is whether MERS has the legal authority to initiate a nonjudicial foreclosure and to exercise the power of sale.

- 13 -

# 1

## Mootness

This Court has said "that the principle of mootness applies in actions for equitable relief, and that declaratory judgment will not be rendered on moot questions." Boyer v. Bedrosian, 57 A.3d 259, 272 (R.I. 2012) (citing Town of Scituate v. Scituate Teachers' Association, 110 R.I. 679, 684, 296 A.2d 466, 469 (1972)). In describing the mootness doctrine, "[w]e 'ha[ve] consistently held that a case is moot if the original complaint raised a justiciable controversy, but events occurring after the filing have deprived the litigant[s] of a continuing stake in the controversy.'" Id. (quoting State v. Medical Malpractice Joint Underwriting Association, 941 A.2d 219, 220 (R.I. 2008). Furthermore, "[i]f this Court's judgment would fail to have a practical effect on the existing controversy, the question is moot, and we will not render an opinion on the matter." City of Cranston v. Rhode Island Laborers' District Council, Local 1033, 960 A.2d 529, 533 (R.I. 2008).

Before this Court, plaintiffs argue that this case is moot because MERS has issued an internal policy change whereby "[n]o foreclosure proceeding may be initiated * * * in the name of [MERS]," and "[t]he Certifying Officer must execute an assignment of the Security Interest from MERS before initiating foreclosure proceedings." Furthermore, plaintiffs inform us that Aurora is no longer the servicer of the Bucci loan and that Lehman Brothers no longer holds the note. Therefore, plaintiffs argue that any decision made by this Court would be merely hypothetical, because the parties no longer have an ongoing stake in the outcome of this case.

The defendants respond by arguing that, despite the change in the identities of the servicer and lender, MERS continues to be the mortgagee, and its ability to exercise its rights under the mortgage remain in question. Furthermore, defendants contend that MERS's voluntary

cessation of foreclosure proceedings, through its internal policy change, is insufficient to render the case moot.

This Court has had few opportunities to address whether a defendant's voluntary cessation of allegedly improper conduct will render a case moot, but we have discussed the issue on occasion. In Tanner v. Town Council of East Greenwich, 880 A.2d 784, 794 n.11 (R.I. 2005), "[w]e note[d], without determining, that the voluntary cessation of an activity may not necessarily moot the remedy of injunctive relief." Then recently, in Boyer, we said, "it is well recognized that '[a] defendant's voluntary cessation of allegedly unlawful conduct ordinarily does not suffice to moot a case.'" 57 A.3d at 281 (quoting Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., 528 U.S. 167, 174 (2000)).

In describing the reason behind this rule, the United States Supreme Court has said that "[t]he voluntary cessation of challenged conduct does not ordinarily render a case moot because a dismissal for mootness would permit a resumption of the challenged conduct as soon as the case is dismissed." Knox v. Service Employees International Union, Local 1000, 132 S. Ct. 2277, 2287 (2012). Thus, if the court were to dismiss the case as moot, it "would * * * leave '[t]he defendant * * * free to return to his old ways.'" Friends of the Earth, Inc., 528 U.S. at 189 (quoting City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283, 289 n.10 (1982).

"In accordance with this principle, the standard * * * for determining whether a case has been mooted by the defendant's voluntary conduct is stringent: 'A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" Friends of the Earth, Inc., 528 U.S. at 189 (quoting United States v. Concentrated Phosphate Export Assn., Inc., 393 U.S. 199, 203 (1968) (emphasis added)). Therefore, "[t]he 'heavy burden of persua[ding]' the court that the challenged conduct

cannot reasonably be expected to start up again lies with the party asserting mootness."[8] Id. (quoting Concentrated Phosphate Export Assn., Inc., 393 U.S. at 203).

The plaintiffs assert that the case is moot because MERS has amended its internal rules such that "[n]o foreclosure proceeding may be initiated * * * in the name of [MERS]," and the mortgage must be assigned to another entity "before initiating foreclosure proceedings." In our opinion, this is merely a voluntary cessation by MERS of the activity that plaintiffs have challenged—the initiation of foreclosure proceedings. Therefore, "[t]he 'heavy burden of persua[ding]' th[is] [C]ourt that the challenged conduct cannot reasonably be expected to start up again lies with" plaintiffs. Friends of the Earth, Inc., 528 U.S. at 189 (quoting Concentrated Phosphate Export Assn., 393 U.S. at 203). We conclude, however, that plaintiffs have failed to provide us with any indication that MERS "cannot reasonably be expected to" reinitiate foreclosure proceedings if this case were dismissed as moot. Id. In other words, plaintiffs have not made it "absolutely clear" that the alleged wrongful conduct would not recommence. Id. (quoting Concentrated Phosphate Export Assn., 393 U.S. at 203). As a result, it is our opinion that the issues presented in this case are not moot, and we shall proceed to decide them at this time.[9]

---

[8] We note that this is an unusual case where plaintiffs argue that their own case is moot and defendants contend that it is not. Therefore, because plaintiffs are the parties asserting mootness, it is plaintiffs—not defendants—who have the burden of persuading us that the case is in fact moot. See Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., 528 U.S. 167, 189 (2000).

[9] Because the issues in this appeal are not moot, we need not address defendants' argument that these issues, even if moot, fall within the so-called "extreme public importance" exception to the mootness doctrine.

**2**

**Contractual Authority for MERS to Foreclose and Exercise the Power of Sale**

**i**

**Contractual Relationship between Plaintiffs and MERS**

The plaintiffs argue that the trial justice erred when he "ruled that MERS had the contractual [authority] to invoke the statutory power of sale." In his decision, the trial justice found that "the [m]ortgage specifically granted 'the Statutory Power of Sale' to MERS," and therefore, that MERS had the contractual authority to exercise that power. We agree with the reasoning of the trial justice.

Within the mortgage is a provision that says: "Borrower does hereby mortgage, grant and convey to MERS, (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, with Mortgage Covenants upon the Statutory Condition and with the Statutory Power of Sale, the [mortgaged] property * * *." The mortgage further provides:

> "Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property * * *."

These provisions are clear and leave no room for interpretation. The plaintiffs explicitly granted the statutory power of sale and the right to foreclose to MERS, and consequently, MERS has the contractual authority to exercise that right.

Although there is a later provision in the mortgage that empowers the "Lender" to invoke the statutory power of sale, in our opinion the trial justice was correct when he found that that

subsequent provision did "not negate the previous language in the [m]ortgage directly granting MERS * * * the right to" foreclose and sell the property. Thus, plaintiffs have agreed to grant MERS the power of sale.

**ii**

**Relationship between MERS and the Note Holder**

The plaintiffs next argue that Lehman Brothers never authorized MERS—contractually or as an agent—to act on its behalf because Lehman Brothers never signed the mortgage that named MERS as its nominee. Furthermore, they contend that none of Lehman Brothers' successors or assigns authorized MERS to act on their behalf. Therefore, they assert that the trial justice erred when he found that Lehman Brothers had properly designated MERS as its nominee.[10]

While the contractual issue that was discussed in the previous section dealt with the relationship between plaintiffs and MERS, the argument discussed in this section focuses on the link between MERS and Lehman Brothers (and its successors and assigns). Thus, plaintiffs now

---

[10] The plaintiffs also assert that "any alleged agreement between [MERS and the note holder] violates the Statute of Frauds" contained in G.L. 1956 § 9-1-4. However, plaintiffs failed to raise this argument before the trial justice, and, in accordance with our well-recognized raise-or-waive rule, plaintiffs are precluded from pressing this argument on appeal. See State v. Brown, 9 A.3d 1240, 1245 (R.I. 2010) ("As this Court has made clear, the 'raise-or-waive' rule precludes a litigant from arguing an issue on appeal that has not been articulated at trial." citing State v. Bido, 941 A.2d 822, 828-29 (R.I. 2008)).

Nonetheless, even if plaintiffs had not waived this argument, we believe it to be meritless. Section 9-1-4(1) says that "[n]o action shall be brought * * * [w]hereby to charge any person upon any contract for the sale of lands, tenements, or hereditaments, or the making of any lease thereof for a longer time than one year." This section bars actions brought to prove the existence of contracts for the sale of interests in land that were not reduced to writing. This section does not stand for the principle that an agency agreement relating to a mortgage and real estate loan must also be in writing. Furthermore, this Court has held that "[i]n Rhode Island, an agent's authority to bind the principal need not be in writing." UXB Sand & Gravel, Inc. v. Rosenfeld Concrete Corp., 641 A.2d 75, 79 n.1 (R.I. 1994). Therefore, even if this argument had not been waived, it would still lack merit.

attack the soundness of the second relationship in the contractual triangle among themselves, MERS, and the owner of the note. However, in our opinion, this second relationship is as robust as the first.[11]

A nominee relationship is akin to that of a principal and agent. See Culhane v. Aurora Loan Services of Nebraska, 826 F. Supp. 2d 352, 370 (D. Mass. 2011) ("The term 'nominee' in fact connotes a narrow form of agency * * *."). We have held that the existence of an agency relationship is a question of fact. See, e.g., Credit Union Central Falls v. Groff, 966 A.2d 1262, 1268 (R.I. 2009) ("Whether an attorney-client relationship has formed is a question of fact governed by the principles of agency."); Baker v. ICA Mortgage Corp., 588 A.2d 616, 617-18 (R.I. 1991) (refraining from recognizing the existence of an agency relationship, but remanding the matter to the Superior Court to resolve that question of fact). See also 2A C.J.S. Agency § 5 at 309 (2003) ("The existence of an agency relationship is a question of fact under the circumstances of the particular case * * *."). Although plaintiffs assert on appeal that no agency relationship between MERS and the note holder was proven at trial, it is our opinion that they waived this argument when their counsel agreed before the trial justice that there were no issues of fact in this case. See State v. Brown, 9 A.3d 1240, 1245 (R.I. 2010) ("As this Court has made clear, the 'raise-or-waive' rule precludes a litigant from arguing an issue on appeal that has not been articulated at trial." citing State v. Bido, 941 A.2d 822, 828-29 (R.I. 2008)).

At trial in the Superior Court, the trial justice inquired as to whether the parties could agree on a stipulation of facts. The plaintiffs' counsel responded by saying "I am willing to, I think, agree to most everything that [MERS and Aurora's counsel] has presented from a factual point of view." In addition, plaintiffs' counsel said: "Maybe [the Marchant affidavit] would be

---

[11] The plaintiffs do not challenge the third relationship in the triangle—the one between themselves and Lehman Brothers—on a contractual basis.

the basis for a factual agreement." He later told the trial justice: "I'd think that my brother and I might be able to agree on Paragraphs 1 through 14" of that affidavit. In paragraph five of the affidavit, Marchant states that "[t]he Note has been indorsed in blank and is currently held by LaSalle as the custodian for the beneficial owner of the Note and/or its agents (including MERS) for whom MERS, in its capacity as mortgagee, is the nominee of the beneficial owner of the Note." (Emphasis added.) Because the existence of an agency relationship is a question of fact and the parties, in accepting the Marchant affidavit, agreed that MERS was an agent and nominee of the beneficial owner of the note, plaintiffs may not seek a contrary holding from this Court. See Hagenberg, 879 A.2d at 441. Thus, plaintiffs have waived their agency argument.[12]

**2**

**Statutory Authority for MERS to Foreclose and Exercise the Power of Sale**

The plaintiffs offer an array of statutory arguments to support their position that MERS may not foreclose and exercise the statutory power of sale. First, they contend that G.L. 1956 § 18-10-1 precludes MERS from acting as a nominee for the beneficial owner of the note because it does not specifically authorize an entity such as MERS to hold a mortgage in a nominee capacity. Second, they argue that MERS is not a true mortgagee, but rather that it is a "nominee

---

[12] Even if plaintiffs had not waived this argument, we nonetheless believe that it lacks merit because of MERSCORP's rules of membership to which each member has agreed. Indeed, other courts have held that a contractual relationship exists between MERS and its members, which allows MERS to act on their behalf. See, e.g., Taylor v. Deutsche Bank National Trust Co., 44 So.3d 618, 620 (Fla. Dist. Ct. App. 2010) ("The participants agree to appoint MERS to act as their common agent on all mortgages registered by them in the MERS system."); MERSCORP, Inc. v. Romaine, 861 N.E.2d 81, 83 (N.Y. 2006) ("Members contractually agree to appoint MERS to act as their common agent on all mortgages they register in the MERS system."). Because plaintiffs have conceded that an agency relationship existed when they agreed to that fact in the Marchant affidavit, and because we believe that the current beneficial owner of the note contractually agreed to allow MERS to foreclose on its behalf, we need not address plaintiffs other arguments regarding MERS's contractual ability to be the nominee of the current owner of the note.

- 20 -

mortgagee," which may not exercise the power of sale under § 34-11-22. Finally, they contend that MERS may not foreclose the mortgage because it is not the note holder, a transactional structure which plaintiffs maintain violates § 34-11-21, as well as many other statutes and case law. We shall address each of these arguments in turn.

**i**

**Section 18-10-1**

The plaintiffs cite to § 18-10-1[13] and argue that this section precludes MERS from acting as a nominee because MERS is neither a trust company nor a national banking association; however, they did not raise this statute in their argument before the trial justice. Therefore, this argument is waived. Brown, 9 A.3d at 1245. Nonetheless, it is our opinion that if this argument had been raised below, it would still lack merit. Section 18-10-1, entitled "Authority to register security in name of nominee," provides, in pertinent part, that

> "[a]ny trust company or national banking association doing business in this state * * * may * * * cause any stock, shares, bonds, debentures, notes, mortgages, or other securities in any corporation, business trust, or association, or any other personal property held in any capacity, to be registered and held in the name

---

[13] The full text of G.L. 1956 § 18-10-1 reads:

> "Any trust company or national banking association doing business in this state when acting as executor, administrator, guardian, conservator, testamentary trustee, or trustee under any other instrument, whether alone or jointly with an individual or individuals, may, with the consent of the individual fiduciary or fiduciaries, if any, who are authorized to give consent, cause any stock, shares, bonds, debentures, notes, mortgages, or other securities in any corporation, business trust, or association, or any other personal property held in any capacity, to be registered and held in the name of a nominee or nominees of the trust company or national banking association, which nominee or nominees may be an individual or individuals, a partnership, or a corporation, without mention of the trust or fiduciary relationship in the certificate or other instrument or document representing the property or evidencing the title to the property."

- 21 -

of a nominee or nominees of the trust company or national banking association * * *."

The plaintiffs argue that this section precludes MERS from holding a mortgage in a nominee capacity because MERS is neither a trust company, nor a national banking association. Thus, they contend, MERS may not hold the mortgage as a nominee because the statute does not specifically grant it this right. However, we do not construe the statute as precluding MERS from acting as a nominee simply because it authorizes other entities to do so. Therefore, we conclude that this section has no effect on MERS's ability to act in a nominee capacity.

**ii**

**Section 34-11-22 and MERS's Status as Mortgagee**

The plaintiffs next contend that MERS is not a true mortgagee, but rather that it is a "nominee mortgagee," an amorphous creature that they maintain is not contemplated by any Rhode Island statute. Because MERS is not a true mortgagee, they argue, it may not exercise the statutory power of sale contained in § 34-11-22. The defendants counter by arguing that the power of sale is a right that is derived from contract, not from statute, and that § 34-11-22 merely regulates the manner in which that contractual right may be exercised; it does not, they maintain, dictate to whom or to what that power may be granted. Thus, they contend that the statute does not preclude MERS from being named as mortgagee. To put it succinctly, the question that is before this Court is whether MERS, acting in a nominee capacity for the owner of the note, can be a "mortgagee" as that term is used in § 34-11-22. We answer that question in the affirmative.

Section 34-11-22 provides, in pertinent part:

> "The following power shall be known as the 'statutory power of sale' and may be incorporated in any mortgage by reference:
>
> "(Power)

> "But if default shall be made in the performance or observance of any of the foregoing or other conditions, or if breach shall be made of the covenant for insurance contained in this deed, then it shall be lawful for the mortgagee or his, her or its executors, administrators, successors or assigns to sell * * * the premises hereby granted or intended to be granted, or any part or parts thereof, and the benefit and equity of redemption of the mortgagor and his, her or its heirs, executors, administrators, successors and assigns therein, at public auction * * *."

As defendants have correctly framed it, the right to exercise the power of sale in a mortgage is derived from contract, not statute. Thurber v. Carpenter, 18 R.I. 782, 784, 31 A. 5, 6 (1895) (describing the right to exercise the power of sale in a mortgage as "a matter of contract"); see also 55 Am. Jur. 2d Mortgages § 472 at 202 (2009) ("The power to sell under a mortgage or deed of trust is a matter of contract between the mortgagor and mortgagee under the conditions expressed in the instrument, and does not exist independently of it."). Indeed, the contractual power of sale was recognized long before § 34-11-22 was enacted in 1927 (P.L. 1927, ch. 1056, § 14). See Thurber, 18 R.I. at 784-85, 31 A. at 6 (recognizing the power of sale in 1895). Furthermore, "though regulated by statute * * * nonjudicial foreclosure is a private procedure involving private parties, occurring pursuant to a private power of sale contained in a [mortgage]." 55 Am. Jur. 2d Mortgages § 472 at 202.

This Court has recognized that, in such private transactions, "competent persons shall have the utmost liberty of contracting and that their agreements voluntarily and fairly made shall be held valid and enforced in the courts[ ] unless a violation of the law or public policy is clear and certain." Gorman v. St. Raphael Academy, 853 A.2d 28, 38 (R.I. 2004) (quoting Wechsler v. Hunt Health Systems, Ltd., 216 F. Supp. 2d 347, 354-55 (S.D.N.Y. 2002) (emphasis added)). In our opinion, the designation of MERS as grantee of the mortgage, as nominee for the lender, was

not a "clear and certain" violation of § 34-11-22. <u>Gorman</u>, 853 A.2d at 38 (quoting <u>Wechsler</u>, 216 F. Supp. 2d at 355).

The Legislature has made it explicit that the power of sale provision contained in § 34-11-22 "<u>may</u> be incorporated in any mortgage by reference," but its use is not required. (Emphasis added.) Therefore, it is readily apparent that this section was enacted for the purpose of establishing a uniform power of sale provision that could be referred to with ease, if the parties so desired; the purpose of this section was not to define or limit whom the parties could name as a mortgagee. <u>See</u>, <u>e.g.</u>, <u>Eaton v. Federal National Mortgage Association</u>, 969 N.E.2d 1118, 1127 n.16 (Mass. 2012) (holding that, in Massachusetts, "the power [of sale] was given statutory form to shorten the length of mortgage instruments").

We hold that the trial justice was correct when he found that "MERS is the mortgagee because the Mortgage executed by [plaintiffs] so states," and "[t]he fact that MERS acts in a nominee capacity for the lender and the lender's successors and assigns does not diminish MERS's role as mortgagee[,] nor [does it] create[] a new legal term 'nominee mortgagee,'" which has never been recognized by this Court. Therefore, MERS's designation as nominee under the mortgage, albeit as the holder of legal title only, does not proscribe its authority to exercise the power of sale under the provisions of § 34-11-22.

**iii**

**Whether the Mortgagee and the Note Owner Must be the Same Entity**

In plaintiffs' final line of argument, they concede that none of the statutes governing mortgagees explicitly prohibit MERS from foreclosing a mortgage and exercising the statutory power of sale. Rather, they contend that these statutes, as well as case law, implicitly prohibit MERS from doing so. Specifically, they argue that the legislation regulating mortgagees

requires that there be unity in the note holder and mortgagee and that an entity like MERS, which holds the mortgage but not the note, is, as a result, prohibited from foreclosing on the mortgage. The defendants respond by reiterating that contractual agreements that are entered into voluntarily are to be enforced unless they clearly violate the law or some well-defined public policy. They contend that the mortgage in this case does neither.

Stated succinctly, this Court must decide whether our law would preclude a foreclosure by MERS because such foreclosures are not explicitly authorized, or, alternatively, whether our law would authorize them because they are not explicitly precluded. We believe the latter to be correct.

The plaintiffs cite a plethora of statutes that they contend support their position; each of those statutes employs the term "mortgagee."[14] According to plaintiffs, all of these statutes either (1) place obligations on a "mortgagee" that MERS does not itself fulfill, but which are instead fulfilled by the note holder or a servicer; or (2) more generally imply that the mortgagee and note owner must be one and the same. We are fully aware that these statutes were originally enacted during a time when the mortgagee and note holder were almost always the same entity. In the modern world of lending, however, that is no longer the case. Thus, we are confronted with the same problem with which many courts before us have struggled—the "difficulty of attempting to shoehorn a modern innovative instrument of commerce into nomenclature and legal categories which stem essentially from the medieval English land law." Mortgage Electronic Registration Systems, Inc. v. Revoredo, 955 So. 2d 33, 34 (Fla. Dist. Ct. App. 2007).

---

[14] These statutes include: G.L. 1956 §§ 19-9-2, 19-9-2.1, G.L. 1956 §§ 27-5-3, 27-5-6, §§ 34-11-1.3, 34-11-12(4), 34-11-19, 34-11-20, 34-11-21, 34-11-22, 34-11-24, G.L. 1956 §§ 34-26-3, 34-26-5, G.L. 1956 §§ 34-27-3.1, 34-27-4, 34-27-6, and G.L. 1956 § 44-5-7.

Nonetheless, and despite the feudal roots of these enactments, we do not construe them to preclude an entity like MERS from acting as a nominee on behalf of the note owner.

In a recent case that bears striking similarities to the one at bar, the Supreme Judicial Court of Massachusetts came to that same conclusion. Eaton, 969 N.E.2d at 1129-31.  In that case, the plaintiff took out a loan and executed a promissory note made payable to the lender. Id. at 1121. She also executed a mortgage that named MERS, and its successors and assigns, as the mortgagee, "solely as nominee" of the lender and its successors and assigns. Id. at 1121-22, 1128.  The mortgage granted MERS the statutory power of sale and the right to foreclose. Id. at 1122.  MERS then assigned the mortgage to another entity that later sold the mortgaged property at a foreclosure sale, after there had been a default on the note. Id.  The issue that was before the court was whether the statutes regulating foreclosures required that the foreclosing mortgagee also hold the underlying note. Id. at 1121.

The court pointed out that several of the statutes in the Massachusetts General Laws that deal with mortgage foreclosures were drafted as though the mortgagee and note holder would be the same entity. Eaton, 969 N.E.2d at 1128-29.  However, in rendering its decision, the court said:

> "we do not conclude that a foreclosing mortgagee must have physical possession of the mortgage note in order to effect a valid foreclosure. There is no applicable statutory language suggesting that the Legislature intended to proscribe application of general agency principles in the context of mortgage foreclosure sales. Accordingly, we interpret [the Massachusetts General Laws governing mortgage foreclosures] to permit one who, although not the note holder himself, acts as the authorized agent of the note holder, to stand 'in the shoes' of the 'mortgagee' as the term is used in these provisions."[15] Id. at 1131.

---

[15] In that case, MERS had assigned the mortgage to another entity that conducted the foreclosure. Eaton v. Federal National Mortgage Association, 969 N.E.2d 1118, 1122 (Mass. 2012). Although the court held that an entity could foreclose if it held the mortgage and also either held

Similarly, we do not believe that our General Assembly "intended to proscribe [the] application of general agency principles in the context of mortgage foreclosure sales." Eaton, 969 N.E.2d at 1131. Therefore, we interpret the term "mortgagee" in our statutes in a similar fashion as did the Supreme Judicial Court of Massachusetts. Thus, it is our opinion that none of the statutes that plaintiffs rely upon prohibit MERS from foreclosing on the Bucci mortgage, because in so doing, MERS would be acting as an agent on behalf of the note owner. Furthermore, under our reading of these statutes, any of the obligations placed upon a "mortgagee" may be fulfilled by either the mortgage holder or the owner of the note, provided that an agency relationship exists between the two.

To support their respective arguments regarding the various statutory provisions, the parties cite to case law that this Court will now address. Both plaintiffs and defendants point out the principle of property law providing that a mortgage and note are inseparable. See, e.g., Carpenter v. Longan, 83 U.S. 271, 274 (1872). The parties differ, however, in their assessment of whether the transactional structure in this case violates that principle. The plaintiffs contend that the rule is violated because MERS holds the mortgage but does not hold the note. By contrast, defendants argue that "MERS, as nominee, stands in the shoes of the note owner * * * with respect to the mortgage such that there is no separation."

Black's Law Dictionary 1149 (9th ed. 2009), defines nominee as "[a] person designated to act in place of another, usu[ally] in a very limited way" or "[a] party who holds bare legal title for the benefit of others or who receives and distributes funds for the benefit of others." This

the note or was "act[ing] on behalf of the note holder," the court remanded the case to the Superior Court to determine if there was an agreement that the foreclosing party was in fact acting on the note holder's behalf. Id. at 1134. As stated above, that analysis is unnecessary here because the parties, by accepting the Marchant affidavit, have agreed that an agency relationship was in place.

Court has embraced that definition in the past. See Plainfield Pike Gas & Convenience, LLC v. 1889 Plainfield Pike Realty Corp., 994 A.2d 54, 56 n.5 (R.I. 2010). As nominee, MERS "holds bare legal title" to the mortgage and is acting on behalf of, and at the direction of, the note owner. On the other hand, the note owner retains the beneficial interest, or equitable title, in the mortgage. See Culhane v. Aurora Loan Services of Nebraska, No. 12-1285, 2013 WL 563374 at *6-7 (1st Cir. Feb. 15, 2013); see also Jackson, 770 N.W.2d at 497 ("[O]ur decision turns, in part, on the difference between legal and equitable title to the security instrument in the property * * *.").[16]

Recently, the United States Court of Appeals for the First Circuit has recognized the validity of this type of arrangement. Culhane, 2013 WL 563374 at *6-7. In that case, the court held that

> "there is no reason to doubt the legitimacy of the common arrangement whereby MERS holds bare legal title as mortgagee of record and the noteholder alone enjoys the beneficial interest in the loan.
> "The law contemplates distinctions between the legal interest in a mortgage and the beneficial interest in the underlying debt. These are distinct interests, and they may be held by different parties." Id. at *6.

The court went on to further describe the legal arrangement between MERS and the lender.

> "Where—as at the inception of this loan—the mortgage and the note are held by separate entities, an equitable trust is implied by law. * * * Under such an arrangement, the mortgagee is an

---

[16] We note that, unlike the Rhode Island General Assembly, the Legislature in Minnesota has enacted a statute that allows MERS to record certain documents as a nominee; however, the Supreme Court of Minnesota specifically said that it did not rely on that statute when rendering its decision in Jackson v. Mortgage Electronic Registration Systems, Inc., 770 N.W.2d 487, 494 (Minn. 2009) ("By passing the MERS statute, the legislature appears to have given approval to MERS' operating system for purposes of recording. Nonetheless, the MERS statute is a recording statute, and we conclude that it does not change the requirements of the foreclosure by advertisement statute.").

- 28 -

> equitable trustee who holds bare legal title to the mortgaged premises in trust for the noteholder." Id. at *7.

Finally, the First Circuit concluded that "MERS's role as mortgagee of record and custodian of the bare legal interest as nominee for the member-noteholder, and the member-noteholder's role as owner of the beneficial interest in the loan, fit comfortably with each other and fit comfortably within the structure of Massachusetts mortgage law." Id. We believe that they reside comfortably within the law of our state as well.

Because the lender retained equitable title to the mortgage and passed that equitable title to each of its successors and assigns, including the current owner, the mortgage and note have never been separated as plaintiffs contend. Instead, the note and the equitable interest in the mortgage have always remained unified, and the mortgage has "followed the note." Furthermore, the holder of the legal title to the mortgage—MERS—always has acted as an agent of the owner of the equitable title. In our opinion, this transactional structure is consistent with the law of this state.

Legal title refers to that which "evidences apparent ownership but does not necessarily signify full and complete title or a beneficial interest." Black's Law Dictionary 1622 (9th ed. 2009). Equitable title, on the other hand, pertains to that which "indicates a beneficial interest in property." Id. We believe that MERS, as the holder of legal title, may be denominated as the mortgagee in the mortgage and may foreclose on behalf of the note owner. However, the proceeds from a foreclosure sale, which are part of the beneficial interest, belong to the owner of the note, who holds the equitable title. This view is supported by the Restatement (Third) Property (Mortgages) § 5.4(c) at 380 (1997), which provides that "[a] mortgage may be enforced only by, or in behalf of, a person who is entitled to enforce the obligation the mortgage secures." (Emphasis added.)

- 29 -

Comment e. to that section provides further guidance. That comment says that "in general a mortgage is unenforceable if it is held by one who has no right to enforce the secured obligation." Restatement (Third) Property § 5.4, cmt. e. at 385. However,

> "This result is changed if [the mortgage holder] has authority from [the note owner] to enforce the mortgage on [the note owner]'s behalf. For example, [the mortgage holder] may be a trustee or agent of [the note owner] with responsibility to enforce the mortgage at [the note owner]'s direction. [The mortgage holder]'s enforcement of the mortgage in these circumstances is proper. * * * The trust or agency relationship may arise from the terms of the assignment, from a separate agreement, or from other circumstances. Courts should be vigorous in seeking to find such a relationship, since the result is otherwise likely to be a windfall for the mortgagor and the frustration of [the note owners]'s expectation of security." Id. at 385-86.

Here, MERS was attempting to enforce the mortgage "[o]n behalf of" the owner of the note, a party that is unquestionably "entitled to enforce the obligation the mortgage secures." Restatement (Third) Property § 5.4(c) at 380. Therefore, we see no reason why MERS, as an agent of the owner of the note, cannot foreclose on behalf of that entity.[17]

---

[17] The plaintiffs also argue that the trial justice erred in not finding that MERS's own regulations prohibit it from collecting money, holding promissory notes, or foreclosing in its own name. However, this argument is not developed in plaintiffs' briefs. As this Court has said in the past, "[a] mere passing reference to an argument such as this, without meaningful elaboration, will not suffice to merit appellate review." State v. Day, 925 A.2d 962, 974 n.19 (R.I. 2007). Nonetheless, even if this were properly before us, we fail to see any error in the trial justice's decision. The issues raised by plaintiffs in this case involve MERS's right to foreclose and exercise the statutory power of sale. Therefore, even if MERS decided not to go forward with a foreclosure sale based on its own regulations, the trial justice's failure to make such a finding was not error.

The plaintiffs also argue that the trial justice erred by considering the economic impact that his decision would have if he had granted their requests for injunctive and declaratory relief. However, we see no merit in this contention either. After a thorough review of the record, we can find nothing that would suggest that the trial justice was swayed by any potential economic impacts of his decision. He never discussed any economic considerations in his decision, and all his conclusions are supported by sound legal analysis. Therefore, we can discern no error on the part of the trial justice regarding this argument.

## III

## Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court, and the papers in this case may be remanded thereto.



# RHODE ISLAND SUPREME COURT CLERK'S OFFICE

## *Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**    Anthony Bucci et al. v. Lehman Brothers Bank, FSB et al.

**CASE NO:**    No. 2010-146-Appeal.
(PC 09-3888)

**COURT:**    Supreme Court

**DATE OPINION FILED:**    April 12, 2013

**JUSTICES:**    Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**    Associate Justice Francis X. Flaherty

**SOURCE OF APPEAL:**    Providence County Superior Court

**JUDGE FROM LOWER COURT**:

Associate Justice Michael A. Silverstein

**ATTORNEYS ON APPEAL:**

For Plaintiffs:  Keven A. McKenna, Esq.
                 Corey J. Allard, Esq.

For Defendants:  Charles C. Martorana, Esq.